IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 8, 2017

## STEVEN WOODROW JOHNSON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
No. 2010-B-977    Mark Fishburn, Judge

### No. M2016-02363-CCA-R3-PC

A Davidson County jury convicted the Petitioner, Steven Woodrow Johnson, of first degree felony murder, especially aggravated burglary, aggravated burglary, aggravated assault, and possession of a firearm during the commission of a dangerous felony, and the trial court sentenced him to an effective sentence of life in prison. This court affirmed the Petitioner's convictions on appeal, save the especially aggravated burglary conviction, which we modified to aggravated burglary. *State v. Steven Woodrow Johnson*, M2011-00859-CCA-R3-CD, 2012 WL 3877787, at *1 (Tenn. Crim. App., at Nashville, Sept. 7, 2012), *perm. app. denied* (Tenn. Feb. 13, 2013). In 2013, the Petitioner filed a petition for post-conviction relief alleging that he had received the ineffective assistance of counsel. The post-conviction court held a hearing on the petition and denied relief. On appeal, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and J. ROSS DYER, JJ., joined.

Manuel B. Russ, Nashville, Tennessee, for the appellant, Steven Woodrow Johnson.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Glenn R. Funk, District Attorney General; and Janice Norman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts and Procedural History

This case arises from the death of the victim, John Young, inside his home during a home invasion. For this offense, a Davidson County grand jury indicted the Petitioner for first degree felony murder, especially aggravated burglary, attempted especially

aggravated robbery, aggravated burglary, aggravated assault, and possession of a firearm during the commission of a dangerous felony.

## A. Trial

In our opinion on the Petitioner's first appeal, this court summarized the facts presented at trial as follows:

Officer Eric Bacon with the Metropolitan Nashville Police Department testified that in the early morning hours of November 23, 2008, he responded to a shooting call at a residence located at 524 Wesley Avenue in East Nashville. Upon entering the residence through the front door, Officer Bacon briefly spoke with George Young, the victim's roommate and brother. He then went to the rear bedroom where the victim, John Young, was "near death," lying on the bed with a gunshot wound to his head. Upon entering the bedroom, Officer Bacon discovered a revolver on the floor next to the victim's foot and secured it. Paramedics soon arrived to transport the victim, and Officer Bacon was able to conduct a walk-through of the residence. He observed that the back door had been forced open, shell casings were scattered on the floor, and bullet holes were in the walls.

George M. Young, Jr. testified that he resided at 524 Wesley Avenue with the victim. On the night of November 22, 2008, they watched a football game and went to bed around 10:30 p.m. A few moments later, Mr. Young heard a knock at the back door. The victim went to the bathroom window through which he could see two men standing on the back porch; Mr. Young stood beside the victim. The victim told the two people to leave, and they complied. From the front door of the residence, Mr. Young then observed the two men walking west down the street. The victim told Mr. Young that the men stated that "Dewayne" sent them to borrow money. After Mr. Young returned to bed, a noise in the home awakened him, and he discovered a man in his room, pointing a gun at his face. The man told him to get up. When Mr. Young stood up, the man hit him in the back of the head with his gun, knocking him to the floor. Gunshots began to ring out, and Mr. Young lay face down on the floor. Mr. Young then heard glass breaking, which the shooter caused by jumping through the bedroom window. Mr. Young called 9-1-1 and called out to his brother. However, he "never could hear anything." Mr. Young testified that he kept some money in the back of his closet, but the intruder did not take anything from the home that night.

2

Richard Allen testified that he resided at 308 Dinwiddie Drive with Robert Taylor and Mr. Taylor's wife, Crystan Shawn Taylor. On the evening of November 22, 2008, Allen was in possession of Crystan's cellular phone. He received a call from [the Petitioner] in which he asked if Allen "wanted to go out and do something." [The Petitioner] thereafter drove to Allen's residence with [the Petitioner's] brother, Richard Johnson, and another man whom Allen had never met before. The men all got into [the Petitioner's] vehicle, and Allen had a conversation in the back seat of the vehicle with the man whom he did not know. Allen testified that the man "[w]anted to hit a lick. They were going to do a robbery." Allen stated that the man wanted $60,000 that was in a shoe box in the home of "two old guys." Allen was not certain if [the Petitioner] could hear the conversation, but Allen asked [the Petitioner] what he thought about the conversation. However, Allen could not recall how [the Petitioner] replied. Allen then stepped out of the vehicle and returned to his house, not wanting to participate in the robbery. Allen left instructions with Crystan "to just answer the phone and say no[,]" if [the Petitioner] called. Allen and Robert Taylor then left the residence to go to a tattoo shop. After hearing about the home invasion and murder on the news, Allen contacted [the Petitioner] the next day and asked [the Petitioner] if he had been involved. [The Petitioner] responded that he had no involvement in the reported incident.

Crystan Shawn Taylor testified that on November 22, 2008, Allen was in possession of her cellular phone at their residence while she was at a tattoo shop with a friend. When Crystan returned home, Allen was leaving the residence with Robert Taylor, and Allen stated to Crystan that "[the Petitioner] may call. If he calls, tell him I'm not here and I said no." After midnight, Crystan received a call from [the Petitioner], asking for "Ricky." Crystan responded that "Ricky said to tell you he's not here and he said no," although she did not know the meaning of her response. [The Petitioner] then replied, "[T]hat's all I need to know."

Alicia Catherine Johnson, [the Petitioner's] wife, testified that in 2008, she and [the Petitioner] resided with [the Petitioner's] parents in their home at 1221 London Bridge Road. [The Petitioner's] brother, Richard Johnson, also resided there. She stated that she and [the Petitioner] were arguing constantly, and their marriage was "falling apart." On the evening of November 22, 2008, she was at a family dinner at church with [the Petitioner], Wendy Johnson, Richard Johnson, and other family members. Also in attendance was a man named Francisco Ancona, whom Alicia knew

3

as "Brobro," and Gail Barber. At the dinner, Alicia overheard [the Petitioner] and Ancona talking about "hitting a lick." Although she did not think they were referring to committing a robbery, she knew this term could refer to a robbery. She stated that she thought [the Petitioner] said the term, but she was "not positive." She stated that, although she did not know what they were referring to, it made her feel "sick" because "anything that has to do with hitting a lick would be somebody getting in trouble." After the dinner, she and [the Petitioner] returned home with their children in his vehicle. Alicia got into an argument with [the Petitioner], and [the Petitioner] left the home. Alicia began calling [the Petitioner] on his cellular phone, but he did not answer. Later that night, [the Petitioner] returned home with Richard Johnson. They were carrying Ancona into the home. Ancona had a cut on his leg, and the two men put him into the shower. Alicia testified that she knew something was wrong because [the Petitioner] was very upset. Wendy Johnson and Barber also appeared at the home between 3:00 a.m. and 6:00 a.m. [The Petitioner] would not tell Alicia what had happened, but later [the Petitioner] turned on the news, which was broadcasting a story about the victim, and stated, "[T]hat's it."

Alicia Johnson further testified that [the Petitioner] and [the Petitioner's] fiancee, Tangia Tobitt, contacted her and attempted to "intimidate" her about testifying. She stated that she was afraid of them. Alicia spoke to Detective Curtis Hafley with the Metropolitan Nashville Police Department about the incident on two occasions, but she gave different statements each time. She said she was scared the first time, and the second time she "felt more comfortable" with Detective Hafley. In her first statement on May 28, 2009, Alicia told Detective Hafley that she was asleep when [the Petitioner] and the other men came to the home that night, and a loud noise awakened her. However, she did not mention Wendy Johnson and Barber being in the home or that she saw any blood. She gave her second statement to Detective Hafley on March 28, 2010, in which she proffered this additional information. However, she did not tell Detective Hafley about the conversation she overheard between [the Petitioner] and Ancona at the family dinner about "hitting a lick" because she "didn't want to get in trouble." She only revealed that information shortly before trial.

Elizabeth Gail Barber testified that on November 22, 2008, she and her son went to the Walmart parking lot in Madison, Tennessee, to meet [the Petitioner], Richard Johnson, and Ancona, whom she knew as "Frank." Wendy Johnson was also at the meeting. [The Petitioner] asked Barber if she "wanted to make some money, about a thousand dollars." They wanted

4

to use her vehicle, a Chevrolet S-10 truck, "[g]oing to the robbery." She stated that she followed [the Petitioner] in his vehicle to a side street off Trinity Lane, where they exchanged vehicles, and she saw [the Petitioner] remove a gun from the middle console of his vehicle. She stated that she thought "that they were going to use [the gun] to go do the robbery," meaning she thought Ancona was going to take the gun into the home when he committed the robbery. Richard Johnson and Ancona then took her truck "to go by and do the robbery." After Richard Johnson and Ancona took Barber's vehicle, she and Wendy Johnson went with [the Petitioner] in his vehicle.

[The Petitioner] then drove to a White Castle restaurant and waited in the parking lot. Barber heard [the Petitioner] talking on the phone to someone, asking "if that was gunshots" approximately twenty to twenty-five minutes after the meeting on Trinity Lane. Richard Johnson and Ancona then approached them in Barber's truck, and Ancona got into [the Petitioner's] vehicle. [The Petitioner] drove them to his parents' home, where she saw Alicia Johnson come out on the porch.

Barber further testified that she did not tell Detective Hafley that her two-year-old son was with her that night because she was "afraid that [she] would lose her child." She also told Detective Hafley during her interview that she saw [the Petitioner] with a gun while at the Walmart parking lot, but she actually saw it on Trinity Lane "[b]ecause after thinking about it, that's where I actually seen [sic] it the first time." She further stated that while at the Walmart parking lot, [the Petitioner] was sitting in his vehicle with the door open when Ancona, who was standing outside, and [the Petitioner] agreed that Ancona would be the one to enter the home and commit the robbery.

Detective Paul Harris with the Metropolitan Nashville Police Department testified that he assisted Detective Hafley in the investigation. Approximately eighty-eight hours after the incident occurred, Detective Harris arrested a suspect named Francisco Ancona. At the time of arrest, Ancona told police he was waiting on a ride from [the Petitioner], and Ancona gave [the Petitioner's] address as his place of residence. Detective Harris considered [the Petitioner] a potential suspect because "there was a fair amount of speculation that someone would have assisted Francisco Ancona in the homicide. . . ." Detective Harris spoke with [the Petitioner] on November 24, 2010, about his relationship with Ancona. That was [the Petitioner's] first interview with police concerning this incident. [The

5

Petitioner] stated that he took Ancona to an Express Market at approximately 8:30 p.m. on November 22, 2008, and did not have any more contact with Ancona until around noon the next day. [The Petitioner] stated that he was sick that evening and had been at home sleeping all night. After the interview, [the Petitioner] was not placed under arrest and was allowed to leave the station.

Kevin Carroll, an investigator with the Davidson County Sheriff's Office, testified that Ancona's visitation report indicated that [the Petitioner] visited Ancona in jail seven times between November 30, 2008, and January 25, 2009. Ancona's visitation report also showed that [the Petitioner] was listed as "sibling." Carroll further testified about Ancona's recorded telephone calls, and he identified five calls that were played for the jury.

Special Agent Richard Wesley Littlehale, Assistant Special Agent in charge of the technical services unit for the Tennessee Bureau of Investigation, testified that Detective Hafley and the District Attorney General's office contacted him to assist in analyzing telephone records pertaining to the case and in preparing a visual aid to present to the jury. He explained the process of collecting and analyzing cellular phone data, and he created a map based on call records and addresses that Detective Hafley provided him.

Detective Curtis Hafley with the Metropolitan Nashville Police Department testified that he was the lead detective in the case and responded to the crime scene at 524 Wesley Avenue at 2:30 a.m. on November 23, 2008. Detective Hafley determined that the rear door of the victim's residence was the point of entry and that George Young's bedroom window was the suspect's point of exit. After the police took Ancona into custody on November 23, 2008, Detective Hafley obtained a search warrant on November 24 for 1221 London Bridge Road because Ancona listed that address as his place of residence. Detective Hafley also obtained Ancona's jail telephone call records and cellular phone records of [the Petitioner] and Ancona, among other potential suspects.

A few weeks later, a member of the Young family contacted Detective Hafley regarding a letter that Josh Young, the victim's son, had sent. Josh Young was incarcerated in the Cheatham County Jail with Richard Allen, and Allen claimed to have information about the incident. Detective Hafley interviewed Allen at the jail, and Allen supplied Detective

6

Hafley with details about [the Petitioner's] attempt to get Allen involved in the robbery. Detective Hafley corroborated the information with cellular phone records. Detective Hafley later received recordings of Ancona's telephone calls from prison to [the Petitioner]. He discovered that from the time of Ancona's arrest on November 23, 2008, and [the Petitioner's] arrest on January 26, 2009, there were about a dozen calls between Ancona and [the Petitioner].

Detective Hafley formally interviewed [the Petitioner] on January 26, 2009, which was [the Petitioner's] second interview with police. [The Petitioner] first told Detective Hafley the same story he told Detective Harris, stating that on the night of the incident he had been sick, had slept all night, and he had not seen Ancona until the next day. As the interview progressed, [the Petitioner] changed different aspects of his story. At first, [the Petitioner] denied knowing anything about the incident until after it occurred, but then [the Petitioner] informed Detective Hafley that Ancona previously told him "he was going to hit a good lick." [The Petitioner] then stated that Wendy Johnson contacted him on behalf of a man named Dewayne Vaughan to commit a robbery, but he and Ancona never discussed the robbery. However, when interviewing Vaughan "a day or two" after [the Petitioner], Vaughan denied meeting [the Petitioner], and no cellular phone records indicated that they had communicated. Later, [the Petitioner] stated that he, in fact, left his home two times that night to look for Ancona, who had called him wanting a ride. However, [the Petitioner's] story of the events did not correlate with cellular phone records and other statements, and Detective Hafley confronted [the Petitioner] about the inconsistencies. [The Petitioner] later stated that he spoke to Allen about recruiting him to commit the robbery. He said that he drove to Allen's house with Richard Johnson and Ancona, where Ancona attempted to recruit Allen to participate.

Approximately three hours into the interview, [the Petitioner] added that Richard Johnson and Ancona drove Barber's truck to commit the robbery. After claiming he was at his home when the robbery happened, [the Petitioner] subsequently stated that he was, in fact, out driving by himself at the time of the robbery. Approximately four hours into the interview, [the Petitioner] admitted that he went to the Youngs' home the first time with Richard Johnson and Ancona under the pretext that a man named "Dewayne" sent them in an attempt to get money. [The Petitioner] stated that he took Richard Johnson and Ancona to a church behind the Youngs' residence, and he waited in his vehicle while the other two men

7

went up to the home. [The Petitioner] agreed with Detective Hafley that had the first attempt gone as planned, he would have been the "getaway driver." [The Petitioner] also stated to Detective Hafley that he was not going to get anything from the robbery and that he did not want any money. Detective Hafley further testified about the time and location of calls made by [the Petitioner] and Ancona using cellular phone records.

Sandra Parrish Thomas, M.D., an assistant medical examiner for the Davidson County Medical Examiner's Office, testified that she reviewed the autopsy of the victim, although she did not conduct the autopsy herself. She testified that the victim died from a single gunshot wound to the head.

[The Petitioner] . . . testified that he was not truthful with police in his interviews because he had received a threatening telephone call warning him not to testify against Ancona. The telephone call caused him to fear for the safety of his family. He stated that by the end of his interview with Detective Hafley, however, he had told the detective everything he knew about the incident. [The Petitioner] testified that two weeks prior to the incident, Wendy Johnson took him to meet Dewayne Vaughan, who wanted him to participate in a robbery, but [the Petitioner] said he was not interested. [The Petitioner] denied having a conversation with Ancona at the family dinner the night of the incident about "hitting a lick." [The Petitioner] testified that Ancona asked him to take him and [the Petitioner's] brother, Richard Johnson, to buy marijuana that night. Ancona directed them to an area close to 524 Wesley Avenue, although [the Petitioner] did not know a robbery was going to be attempted at that time. [The Petitioner] testified that he learned that his brother and Ancona actually made the first robbery attempt after the robbery attempt had occurred.

[The Petitioner] further denied having a gun in his truck the night of the robbery and stated that he never saw anyone with a gun that night. However, he stated that he heard Ancona and Allen talking about a gun while the two men were seated in the back of his vehicle. [The Petitioner] admitted that he placed the telephone call to Allen after the first failed robbery attempt, but he stated he handed the telephone to Ancona after Allen answered because Ancona did not have a phone or any other way of getting in touch with Allen. [The Petitioner] testified that after the failed attempt, he drove Richard Johnson and Ancona to meet with Allen at the Taylor residence. He admitted he was in the car the entire time that Allen and Ancona were talking about "hitting a lick" and "needing a strap."

8

However, [the Petitioner] stated that he was not aware that Ancona was planning to return to the Youngs' residence to attempt the robbery again that night.

[The Petitioner] testified that he was aware Ancona was going to commit a robbery on the evening of November 22, but he did not know when or where. He admitted driving over to the house of a man named "Red," but he denied knowing that Ancona was attempting to recruit him to participate in the robbery. [The Petitioner] was aware that his brother, Richard, had driven Ancona to the Young residence to commit the robbery and that Ancona killed the victim, but [the Petitioner] only learned of this after the incident had occurred. [The Petitioner] further admitted that on the day of the incident, Ancona came back to his house injured during the early morning hours.

*Johnson*, 2012 WL 3877787, at *1-6. The jury convicted the Petitioner of first degree felony murder, especially aggravated burglary, aggravated burglary, aggravated assault, and possession of a firearm during the commission of a dangerous felony. The trial court sentenced the Petitioner to life in prison.

## B. Post-Conviction Proceedings

The Petitioner filed a petition for post-conviction relief, *pro se*. The post-conviction court appointed an attorney, and the attorney filed an amended petition, alleging that the Petitioner had received the ineffective assistance of counsel on the basis that, relevant to this appeal, his trial counsel failed to obtain a satisfactory plea agreement, which in turn led the Petitioner to proceed to trial and become subject to a life sentence. The post-conviction court subsequently held a hearing, during which the following evidence was presented: the Petitioner testified that he hired trial counsel ("Counsel") when he was released on bond and that he met with Counsel many times over the course of eight months preparing for trial. He said that Counsel did not review discovery with the Petitioner nor did he review the witnesses' statements. Together they "briefly" reviewed two interviews the Petitioner had participated in but did not discuss issues of suppression or a defense strategy. The Petitioner asserted that Counsel failed to discuss with the Petitioner plea offers from the State until the day before trial when he informed the Petitioner that the State had offered a plea deal of ten to twenty years. The Petitioner elected to counter with an offer of six years to be served at 100 percent which the State declined. The Petitioner then decided to offer to serve fifteen years, but Counsel told him to think about it and think about going to trial. The Petitioner recalled that his trial began the following day, and he was unsure whether Counsel presented his offer of fifteen years to the State.

9

The Petitioner testified that Counsel showed up late on the day of trial looking disheveled and unprepared. He recalled that Counsel did not discuss the theory of criminal responsibility with him. Counsel untimely filed post-trial motions on the Petitioner's behalf and never discussed the Petitioner's appeal with him.

On cross-examination, the Petitioner agreed that he was never identified as the shooter in this case. He stated that each meeting with Counsel lasted for approximately twenty to forty minutes. The Petitioner agreed that Counsel's argument at trial was that because the Petitioner was not present when the shooting occurred and did not actually intend for the victims to be murdered, he was not culpable under the theory of criminal responsibility. He asserted, however, that if he had fully understood the theory of criminal responsibility, the Petitioner would not have gone to trial based on Counsel's argument. It was during the plea negotiations with the State that Counsel convinced the Petitioner to proceed to trial. The Petitioner stated that his recorded jail calls would indicate that he wanted to accept the State's plea offer.

On the subject of Counsel's cross-examination of witnesses at trial, the Petitioner contended that Counsel did not ask the witnesses any new questions and simply repeated what the State had asked on direct. Counsel did not "defend [the Petitioner] like he should" and he "should have tried harder" to defend the Petitioner at "a hundred percent." Counsel did not ask certain questions of the witnesses the way the Petitioner told him to. He testified that during most of his meetings with Counsel they simply were "socializing" or talking about how things were going well with the case.

Tangia Tobitt, the Petitioner's wife, testified that the night before the Petitioner's trial she received a telephone call from Counsel, and she and the Petitioner listened to the phone call on speaker phone. She overheard Counsel tell the Petitioner that the State had offered him a plea deal, and she told the Petitioner that he should take it. Counsel told the Petitioner that he could "get [the Petitioner] something better" than the State's offer. Ms. Tobitt overheard Counsel say, several times over the course of trial preparation, that the Petitioner could "beat it," meaning win at trial.

On cross-examination, Ms. Tobitt explained that she and the Petitioner were just "hanging out" when his charges were pending and that he did not discuss his case with her much. However, Ms. Tobitt went over the Petitioner's discovery file with him and spoke with him while he was in jail. She also attended his meetings with Counsel and during those "brief short" meetings, Counsel never discussed anything serious with the Petitioner and simply told the Petitioner to "enjoy his kids" and not worry about his case. Ms. Tobitt maintained that the Petitioner wanted to plead guilty, and she said she would be surprised to learn that the State had not put forth a plea offer.

10

Counsel testified that he had been a criminal attorney for twenty-one years and had handled approximately eighteen homicide trials. The Petitioner's case was referred to him and he filed for discovery shortly thereafter. Counsel obtained funding for an investigator who contacted witnesses in an attempt to uncover anything that might be helpful for the Petitioner's case. The Petitioner was "very concerned" about his case and met with Counsel many times. During those meetings, they reviewed discovery together, and Counsel answered the Petitioner's questions about different parts of his case. Counsel did his best to explain the legal side of the Petitioner's case to him to try and "put the puzzle together." Counsel said he explained to the Petitioner the charges and their ranges of punishment.

Counsel recalled that the State did not make a plea offer. As the Petitioner's trial date drew near, the Petitioner became concerned and discussed with Counsel what they could possibly offer to the State so that the Petitioner would not have to go trial. Counsel recalled that he spoke with the Petitioner the night before his trial and that they went "back and forth as to what [they] thought [they] might be able to settle the case for." Counsel reiterated that he did not remember ever receiving an offer from the State. Counsel stated that the offer the Petitioner alleged had been conveyed by the State, ten to twenty years, was outside the sentencing range.

Counsel testified that he told the Petitioner not to worry about the additional cost of going to trial. Counsel was prepared to go to trial well before the trial date. He had no idea why the Petitioner thought he looked unkempt or dirty and said he usually wore suits to court. On the subject of trial preparation, Counsel went over all of his work the day before trial to make sure everything was in order. For a defense theory, Counsel planned to argue that the Petitioner knew the other people involved in the crime and had contact with them on a regular basis but on the occasion of the murder he did not want anything to do with them and did not know that they were planning a robbery. Through cross-examination of the other witnesses, Counsel was trying to prove that the other participants had motives for the killing, and he attempted to show through cross-examination that the witnesses were giving self-serving testimony.

Counsel said he communicated his trial strategy with the Petitioner before and during his trial and throughout the trial checked with the Petitioner to see if he had anything to add or any comments or questions. Specifically, he told the Petitioner, "anything that you're hearing that doesn't sound right or that you remember different[ly], write it down," and Counsel would then check in with the Petitioner before cross-examining a witness. Counsel testified that he reviewed the Petitioner's statements and other recordings, as well as the investigators' notes, and that he met with the investigators several times. Counsel did not recall the Petitioner ever asking him to try to negotiate a

11

plea deal during the trial.

On cross-examination, Counsel testified that, at trial, he had the discovery file and his work notes. The gist of his trial strategy was to develop questions for witnesses as the State put them on the stand, by comparing their testimony to what they had said in prior statements. His defense theory was that the Petitioner had not known his accomplices were planning to rob or kill the victims. Counsel addressed in front of the jury the fact that the Petitioner changed his story when talking to police and argued that the Petitioner was fearful because, without his involvement in the planning, a robbery and murder had occurred and the Petitioner did not know what to do. He argued that the State had not proven that the Petitioner was involved in the conspiracy to commit these crimes.

Regarding a potential plea settlement, Counsel tried to explore negotiating a settlement with the State, but his and the Petitioner's position was that the Petitioner did not have anything to do with the planning of these crimes and that the Petitioner's accomplices acted on their own. In that mindset, Counsel was not going to offer for the Petitioner to plead guilty to any crime. Counsel told the Petitioner that they could possibly win at trial or get a hung jury. Counsel reiterated that he did not relay a plea offer from the State to the Petitioner because the State did not make one. At some point before trial, Counsel relayed to the State that the Petitioner would consider pleading guilty in exchange for a six-year sentence, and the State rejected that offer. Counsel stated that "any plea that [the Petitioner] would have wanted to take," Counsel would have relayed to the State. Counsel testified that he discussed with the Petitioner the concept of criminal responsibility.

Rob McGuire testified that he worked as a prosecutor for the State and that he sat second chair on the Petitioner's trial to assist the lead prosecutor. Mr. McGuire recalled that there were not any internal office discussions at the Davidson County District Attorney's Office about offering the Petitioner a plea settlement. He recalled that the State felt it had a strong case that the Petitioner provided information and planning for the crimes, including identifying the house to be robbed and organizing the participants. The State felt that the Petitioner had a lead role in the planning. Mr. McGuire stated that it was possible that an offer was made for a second-degree murder plea, but his recollection was that the State knew the Defendant would not consider such an offer, so he believed one was never made. He testified that the alleged offer of ten to twenty years was an "illegal sentence" for a homicide offense and would not have been something the State offered.

On cross-examination, Mr. McGuire testified he was the team leader of the division prosecuting the Petitioner's case, so it was unlikely that the lead prosecutor would have made an offer to the Petitioner without discussing it with him first. Mr.

12

McGuire could not recall whether any offers were made to the other participants in the crime. There was a possibility that Counsel approached Mr. McGuire or the other prosecutor with an offer, but Mr. McGuire did not remember that particularly because he recalled that the State planned to go forward with a trial. In other words, no "meaningful" discussions were had about a plea settlement. Mr. McGuire testified that a six-year sentence in this case was not a realistic offer because it was a significant departure from the range of punishment. Mr. McGuire stated that a fifteen-year offer from the Petitioner, if made, would also have been rejected by the State. Again, however, he did not recall such an offer being made.

The post-conviction court subsequently denied the Petitioner's petition and made the following relevant findings:

> There is no evidence before the Court that [Counsel] failed to investigate [the] Petitioner's case. [Counsel] evaluated discovery and discussed discovery with [the] Petitioner. [Counsel] hired a private investigator whom he met with six or seven times prior to trial. [Counsel] developed a trial strategy based on [the] Petitioner's own insistence that he knew his co-defendants and did not know that a robbery would occur. Furthermore, [Counsel's] decision not to speak with or investigate Norman Smith was reasonable since Mr. Smith's alibi had little bearing on [the] Petitioner's own guilt or innocence.

> Moreover, the Court finds that there is no ground for [the] Petitioner's lack of communication claim. Based on [Counsel] and [the] Petitioner's own testimony, they met weekly beginning eight months before trial to discuss the case. [The] Petitioner received discovery and he and [Counsel] discussed different [portions] of the discovery weekly. [Counsel] explained to [the] Petitioner the range of punishment and his potential culpability via criminal responsibility. The trial strategy, which was discussed and agreed to by [the] Petitioner, centered around [the] Petitioner's own insistence that [the] Petitioner did not know a robbery would take place on the day in question.

> Because no evidence exists to support [the] Petitioner's contention that [Counsel] failed to investigate the case or communicate with [the] Petitioner, the first prong of the ineffective assistance of counsel has not been satisfied. Consequently, [Counsel] was not ineffective for failure to investigate the case or communicate with [the] Petitioner.

> . . . .

13

Based on [Counsel] and Mr. McGuire's testimony, the evidence is clear that [the] Petitioner was never offered a plea [deal] by the State. For this reason, [Counsel] did not breach a duty and was not deficient in this regard. The testimony suggests that [the] Petitioner proposed a six years at 100% plea, [Counsel] conveyed that offer to the State (after advising his client that it would be rejected) and the plea was rejected without a counter-offer. A ten to twenty year deal as suggested by [Counsel] certainly would have been favorable to [the] Petitioner, yet the evidence indicates [the] Petitioner was not agreeable to such offer despite his wife's desire that he accept it. Moreover, even if [the] Petitioner had agreed to [Counsel] extending an offer of 10-20 years to the State, the evidence preponderates against the State accepting the offer. The evidence in this case establishes that the State had little interest in entering into plea negotiations with [the] Petitioner because it felt the case against him to be particularly strong and [the] Petitioner to be one of the leaders in the commission of the crime. Although plea negotiations are an integral part of representing criminal defendants, there is no constitutional mandate that the State must participate in the process. Consequently, [the] Petitioner has failed to meet the *Nesbit* test for proving ineffective assistance of counsel in plea negotiations.

It is from the post-conviction court's judgment that the Petitioner now appeals.

## II. Analysis

The Petitioner contends on appeal that the post-conviction court erred when it denied his petition. He maintains on appeal that he received the ineffective assistance of counsel because Counsel failed to obtain a "satisfactory" plea agreement, thus forcing the Petitioner to go to trial and expose himself to a life sentence. The Petitioner also contends that Counsel conveyed to him an erroneous belief that the Petitioner would be found not guilty at trial. The State responds that Counsel's representation of the Petitioner was not ineffective, and that the record shows that no plea offer was forthcoming from the State and any offer from the Petitioner would have been rejected by the State. The State further responds that Counsel proceeded to trial in part based on the Petitioner's lack of interest in a realistic plea deal, and that Counsel prepared for trial and was confident the Petitioner could be acquitted. This, the State contends, does not amount to ineffective assistance of counsel. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional

right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates against it. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely de novo review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should

15

avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the Strickland test by demonstrating there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

> A defendant claiming that trial counsel's performance was deficient in the plea negotiations process has the burden to show by a reasonable probability that, but for counsel's deficient representation, (1) the defendant would have accepted the plea, (2) the prosecution would not have withdrawn the offer, and (3) the trial court would have accepted the terms of the offer, such that the penalty under its terms would have been less severe than the penalty actually imposed.

*Nesbit v. State* 452 S.W.3d 779, 800-01 (Tenn. 2014) (citing *Lafler v. Cooper*, 566 U.S. 156, 163 (2012)).

We conclude that the evidence does not preponderate against the trial court's findings. Counsel and the State's attorney testified that there was no plea offer made by the State in this case and that the offer the Petitioner alleged was made, ten to twenty

16

years, was one that the State would not have conveyed because it did not align with the sentencing range for the charged offense. Counsel testified that he would have conveyed to the State whatever offer was proposed by the Petitioner and did so when the Petitioner proposed a six-year deal that was ultimately rejected. The State's attorney testified that the State did not make a plea offer, and was unlikely to accept an offer from the Petitioner, because of the strong case it developed against the Petitioner as the leader in this crime. The Petitioner has not met his burden of proof that the State ever made a plea offer not conveyed to him by Counsel nor has he shown that but for Counsel's performance he would have been given a plea offer by the State that he would have accepted.

As to his argument that Counsel's advice to the Petitioner that they could win at trial influenced his decision not to take a plea offer, the Petitioner has not provided any evidence that shows that Counsel talked him out of taking a plea by exhibiting confidence that the Petitioner's case could be won at trial. We reiterate that no plea offer was forthcoming and plea negotiations were not likely to produce a mutually agreeable result. As a result, Counsel adopted the strategy to be confident in the Petitioner's chances at trial, as he felt that the State could not prove that the Petitioner had a role in the offenses. Counsel cross-examined the various co-participants in the crime and attempted to convince the jury that the Petitioner was not a leader in or planner of the offenses. This was a reasonable strategic decision based on the evidence presented. Accordingly, we conclude that the Petitioner has not met his burden of proving that Counsel was ineffective and is not entitled to relief.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the post-conviction court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE

17